vacated an arbitration award whereby the arbitrator ruled that Pool Ray Insurance Corporation could join or intervene in an ongoing arbitration initiated by the capstone parties in the Feldman Law Firm. At least three grounds require the court to reverse. Number one, the OSI party submitted their counterclaims to the arbitrator in the ongoing arbitration and those counterclaims included a count, count five, for declaratory relief that specifically sought a declaration that they were still part of the risk distribution pool overseen by Pool Ray. So the OSI parties requested specific declaratory relief against Pool Ray, thereby falling under the arbitrator's jurisdiction and also meaning that the arbitrator could in no way exceed his authority that had been granted by the OSI parties under the submission doctrine. Number two, the questions of intervening in the ongoing arbitration or joining the arbitration or the arbitration of the arbitrator consolidating multiple arbitrations frame procedural questions for the arbitrator alone to decide under a long line of precedent not only issued by the U.S. Supreme Court but also by this court. I'm going to talk in detail specifically about a case from this circuit dating back to 1987. It's not in the briefing. I discovered it this weekend. I think it's in the briefing. And then there's a subsequent case issued by this court that calls that earlier case, which is called Dell E. Webb Construction, into question and says that the subsequent Supreme Court cases of Howsam v. Dean Witter and Green Tree Financial v. Basel have overruled the holding from Dell E. Webb Construction. That's very important for purposes of the arbitrator's authority. And then third, the parties created, administered, monetized, and implemented a captive insurance program that involved a number of different parties working in a symbiotic relationship. They entered into multiple agreements around the same time for the same purpose to create this transaction, formalize it, and run it to operate it. All those contracts coalesced into one, or all those multiple agreements coalesced into one, let's call it unified contract, where they're all interrelated, all for the same purpose, and therefore all the arbitration provisions can be cross-referenced. But there was an agreement, there were two separate arbitration agreements to be arbitrated under different sets of rules. Do we discount that entirely? Well, that is a procedural question for the arbitrator. I don't think the court can discount it. The court can recognize that that issue exists. And as a matter of fact, in a jurisdictional briefing to the arbitrator at the outset of the arbitration, the capstone parties, or the appellants, raised that very issue and said, this is a problem. We have multiple arbitration agreements, some provide for ICC rules and ICC arbitration, the others provide for AAA rules and AAA administration, and one set allows a party unilaterally to select the arbitrator. So we raised that issue and said, this needs to be dealt with. We called that issue a procedural question. Well, let's take a hypothetical, a much simpler one, which is that let's say that we only had one arbitration agreement and it only mentioned ICC rules and it never mentioned AAA rules. It goes to the arbitrator and he says, we're going to use AAA rules here. Is that just a procedural question that he would have the power to implement? Yes. That's the House's case on how do you interpret the governing rules promulgated by the arbitral organization? So the arbitrator can look at the rules, see if there's any way for him to apply other rules and choose those other rules and go ahead and apply those to the arbitration and the Supreme Court precedent allows the arbitrator to make that decision as part of deciding a procedural question. I'm looking at the first issue you raised. You said the parties, OSI parties submitted a counterclaim and they asked for declaratory judgment that they were still part of the risk pool. Yes. Okay. It seems to me that they were more or less forced to participate in that arbitration because they had not, at that point in time, the Third Circuit had not stayed the proceedings in Texas. So either they just defaulted or they got involved and arbitrated within that four-month window. I mean, it seems to me if ultimately the Delaware courts are correct that this should never have been arbitrated in Texas in the first place, that to me is ahead of the argument. Well, they submitted to it. They did it under protest every step of the way. And they did. They did in their answer say that they were not voluntarily participating in the arbitration. Yet they went ahead and submitted their counterclaims nevertheless without being compelled to do so by a court. So there was no motion to compel arbitration here in the Southern District saying, OSI, go arbitrate before Arbitrator Ramos. Rather, they went ahead and participated in the arbitration. They participated in the scheduling. They said this, we're subject to protest the whole time because we've got these proceedings in Delaware. Right. And then we have a finding by the arbitrator in the arbitration award itself where Judge Ramos says no one objected to me as an arbitrator. So you do have that finding which But you've got then the Delaware court saying you shouldn't have been there in the first place, throw it out the window basically. Well, the Delaware court is saying I'm going to construe multiple agreements and the what they call a jurisdiction and venue clause in the capstone services agreement would control where the arbitration is supposed to proceed. That's what, we point that out in the brief that that has never been signed by any party. So it's an un-executed document. But the Delaware court never, the Third Circuit or Delaware court nevertheless held that. The Delaware court, I'm sorry. Held that though, they Yes. We're not going to second guess that are we? No. I mean, I don't think that's even on the table here in this, in this appeal for you, for this court to consider what the Delaware court did. I mean, the Third Circuit's going to decide that and that case is going to be submitted in two weeks to the Third Circuit. Should we wait until that case is over? Pardon me? Should we wait until that case is over? I think the court, this court can decide the issues framed by this appeal without waiting on the Third Circuit because if the court determines that Judge Miller erred in venue vacating the award, then the arbitration that, that was initiated here was the first in time. It, it preceded the filing of the Delaware litigation by several weeks. The Delaware litigation came in response to the arbitration demand that was initiated here in Texas. So that's the way the litigation unfolded. The OSI parties went to the Delaware Chancery Court and obtained a status quo order to try to stop the arbitration. Now, the OSI parties in their briefing say that Poole Ray joined or intervened in the arbitration here in response to the status quo order, but that's not the case. The status quo order issued on May 1, 20, I'm going to say 2012, or 2013, and Poole Ray joined, intervened in the arbitration on April 22nd. So it's physically impossible for Poole Ray to have come into the arbitration as an immediate response to the status quo order to try to move the arbitration forward. So that, that's how things started off, is the arbitration really began this whole thing and everything came in response to it. Now, the Poole Ray parties never tried to go under FAA Section 5 and get the district court to appoint an arbitrator, which is their remedy if they're complaining that OSI, the capstone parties or Poole Ray or the law firm failed to follow the procedures prescribed by the arbitration provision for selecting the arbitrator. So that remedy was available at all times under FAA Section 5, but never seized upon by the OSI parties. So they waived that right to get the court's involvement or intervention early on, and then they came back around on the tail end in a motion to vacate the award and made that argument. And so that's a, to me that's a problem where they had that opportunity early on to straighten everything out, didn't take advantage of it, and then came in on the back end and said, well, it's a Section 10 problem under the FAA because the arbitrator exceeded his authority, whereas we're saying for many reasons the arbitrator did not exceed his authority. And as a matter of fact, one of the cases we cited, the Hamsteen Cumberland music case versus Jerry Williams, Hamsteen Cumberland initiated an arbitration. Williams fought it tooth and nail. He didn't want to go to arbitration. He filed a separate suit. He tried to get an injunction, a temporary injunction to stop the arbitration. He had to be compelled to arbitration. When he got to arbitration, he didn't want to be there. He wouldn't comply with any of the discovery or the arbitrator's orders. The arbitrator ended up sanctioning him for half a million dollars. So that's how contentious this arbitration was. In response to the motion for sanctions filed by Hamsteen Cumberland, Williams filed his own cross motion for sanctions in the arbitration, saying, I want death penalty sanctions against the claimant. So the award comes out against him, and Mr. Williams appeals it on up to this court. This court says, the arbitrator didn't exceed his powers in awarding sanctions against you. You asked the arbitrator for sanctions yourself in your cross motion you submitted that very issue to the arbitrator. And while you've been protesting the whole time, that doesn't matter. In that case, did the arbitrator have the authority to act? Yes. I mean, in this case, they're saying the arbitrator did not have authority to act. And in your case, it proved out that the arbitrator did have the authority to act? Yes, but in this case, the arbitrator did have the authority in the arbitration to act because no one has ever questioned the initial appointment by the capstone parties. So that happened in March. I thought they went to Delaware saying, not about Mr. Ramos individually, but saying this should not be happening in Texas. I thought they immediately went to court and said this should not be happening in Texas. OSI took the position at the outset that there should be no arbitration whatsoever because there was no arbitration agreement. In their briefing here and in the third circuit, they're saying something completely different. Now they're saying, oh yeah, arbitration is what both parties wanted, desired, deserved. So that's a 180-degree switch on their position that started out the case, where they sought a temporary or a TRO and then a preliminary injunction to try to stop the arbitration here because supposedly no arbitration, no valid arbitration agreement existed. And as I said before, the arbitrator found that there was no objection to his appointment as an arbitrator and his ability to conduct the arbitration. And at the outset of the final arbitration hearing, the arbitrator asked, are there any objections? The OSI parties made some objections to the authority of counsel to represent one of the parties, and the arbitrator kept asking any other objections, any other objections. They never once objected to the arbitrator proceeding with the arbitration at the hearing. At the hearing, they asked for attorney's fees, and they brought their claims for affirmative relief, breached contract, fraud, breached fiduciary duty, declaratory judgment. After the hearing, they submit a post-submission brief asking, once again, for the court to award, for the arbitrator to award relief to them, including attorney's fees. And they based that on the Texas statute that allows for, you all are all familiar with it, allows for an award of attorney's fees, would necessarily have to tie into the claims for affirmative relief sought by the OSI parties on the merits. So, all through the arbitration, OSI is seeking affirmative relief and submitting their claims. And when they do that, then they conferred on the arbitrator all the power he needs to decide those issues. And that's why the arbitrator, by definition, cannot exceed his powers, because they've given him all the power he ever needs to do so, to make a decision. And I see my time is up. Yes, you've saved time for rebuttal, Mr. Gorman. Thank you. Thank you, Your Honor. Mr. Lipinski? Good morning, Your Honors. May it please the Court, Neil Lipinski, on behalf of the OSI parties, the appellees, and like my predecessors, I apologize for the quality of my voice. I am also under the weather. And I will acknowledge from the start that this is, for lack of a better word, a sort of interrupted appeal in what seems to be the overarching issue as to whether or not there was a valid arbitration agreement as between the OSI parties and the capstone parties is a question not before this Court. Resulting in a sort of difficult situation, I think, for the bench to have to grapple with as to what it's actually looking at on this appeal. In listening to Mr. Gorman, it seemed to me that in the reply brief for the first time, I saw an argument that Judge Miller in the Southern District had misapplied the first filed principle, first filed rule, and that it should have been dictated under the Sutter case as where the arbitration was filed. That should have been the first court of jurisdiction. The problem with that is I don't believe that's what Sutter says, and what I'm hearing now is there is not an argument that Judge Miller misapplied the first filed rule, which means Judge Andrews was perfectly within his right to rule on that issue. He has ruled on that issue. And to be clear, the issue before Judge Andrews was initially, as it was filed in the Court of Chancery and then removed at the request of the capstone parties to the District Court, was this integration of those three agreements, one being the original feasibility study agreement, which contained an arbitration provision, the second being this engagement letter drafted by the Feldman Law Firm, which also incorporated capstone and had a very similar, if not the same, arbitration agreement, but then that third agreement, that capstone services agreement, that had the superseding and integration clause. And it contained language to the effect of, all other disputes shall have venue and jurisdiction in Delaware. So it was left to Judge Andrews to decide, what does that mean? Can I harmonize these? And our position was, we take that to mean, this case belongs in a court in Delaware. The other side's position, of course, was, our arbitration is going forward in Texas as we speak, which as Judge Owen, you pointed out, we objected to from the start and repeatedly. In any event, in the end, Judge Andrews in Delaware decided that the best way to harmonize the language and have the agreement survive would be to say that arbitration would have to be in Delaware with a Delaware arbitrator. And that's key language that he made a point of clarifying in response to a motion for clarification. Mr. Ramos and his Texas arbitration doesn't meet either one of those requirements. And that is the question now before the Third Circuit. And I apologetically tell the Court that we did not advise the Court that on February 19th, the parties received a letter from the Third Circuit notifying us that they had unanimously, the panel, had unanimously decided that it would rule on the papers. There would be no oral argument on March 16th. So the case will be deemed, submitted on or after, on March 16th to be determined thereafter on the papers. We would assert to the Court that that strongly demonstrates or indicates that there'll be an affirmation. And I think, in response to your questions, Your Honors, that would leave this Court with nothing left to do on this case but to say, if Mr. Ramos and his proceeding don't satisfy those requirements and those requirements are upheld in the Third Circuit, then any other failing by Judge Miller in his application of questions of arbitrability when the issues that are now assaulting his decision, they really matter not. I don't know what the Third Circuit's practice or history is, but on this Court, we reverse a lot of cases that we don't hear oral argument on, so it means nothing to us. So I don't know why we would assume that that's what that Court's going to do. And you shouldn't, Your Honor. From what you heard from me, it was simply my opinion from my experience in the Third Circuit and a recitation of the local rule that that's a unanimous decision by the panel. That said, the arbitration that Judge Andrews compelled under his ruling has already taken place in Delaware and has reached a final conclusion. It is now being challenged in the District Court in Delaware, and I think briefing will be filed on March 6th on a motion to vacate that arbitration decision. There was no argument from Mr. Gorman about the application or distinction, and I expected to hear some, between Buckeye and Justice Scalia's subsequent ruling in the Avis Renicar case, which I think are completely consistent and consistent with what happened in Delaware. So I'll leave that alone for the moment unless the Court has questions. And we'll move on to some of the other issues, like the supplementation of Mr. Ramos's authority. That, I don't believe, was raised below. I understand they're relying on the submission doctrine, so I will address it, although I don't think it applies in these circumstances. Regardless, OSI did not name Poole Ray as a party in its arbitration that it was objecting to, of course, in front of Mr. Ramos. It did not allege any wrongdoing on the part of Poole Ray in that arbitration. What the Court hasn't heard, and maybe read in the papers, is that the testimony of the arbitration, which I was lead counsel in, was that capstone management makes all management decisions, including all the decisions made in this case, for Poole Ray under contract. The Feldman Law Firm, which owns capstone management, are the lawyers for Poole Ray. So all the wrongdoing in those counterclaims were addressed at the folks who were bringing the arbitration demand, the capstone parties. And all the remedies that were sought would have been allowable as a result of the arbitrator finding that those wrongdoings had taken place, had occurred. So what was happening simultaneously, it turns out, was correspondence with a director of finance rather than insurance in Angola. Correspondence began, I guess, by Mr. Feldman, asking really for an arbitration demand under one of the two other arbitration agreements between Poole Ray and OSI. So what Poole Ray was trying to do was initiate its own arbitration initially, it seems. When it found out that there was no director of insurance, it was faced with the problem that this court handled in the Ranzi case. We saw it in the Solomon case as well in the Second Circuit, the idea that if an agreement calls for a particular arbitrator or arbitral organization that no longer exists or cannot answer the call, the court then can't find another arbitrator. The court's left with an agreement it can't enforce and sends the case on to trial. That's what would have happened in this circumstance, but for two reasons. One, Mr. Ramos decided that Poole Ray's actions somehow waived the application or the rights to have ICC under its agreement preside over the arbitration proceeding, and then it was, I guess, within its authority as the arbitrator in the capstone agreement to decide the procedural matter, that is, intervention. The problem with those two points is as follows. There was a second arbitration agreement with Poole Ray, it was between Poole Ray and OSI, and it called for the case to be submitted to the ICC and for the selection of a three-person panel. Mr. Ramos didn't satisfy any of those requirements either. And intervention, although I keep hearing over and over again that it is a matter of procedural arbitrability, seems to be a jurisdictional matter. It is not consolidation of two cases, same parties, same causes of action. Rule 19 governs it. It has been considered a jurisdictional rule, and it's the kind of question that is a question of validity, a gateway question, if you will. So for all of those reasons, Mr. Ramos did not sit in a position of authority to make those determinations. And OSI, of course, objected to all of those rulings. The cases that are relied upon by my opponents are cases in which the same parties to the agreement mutually consent to the addition of issues, of claims that might not be covered under their arbitration agreement to the arbitrator they agreed upon. Those cases aren't helpful at all, and not similar at all to the situation that this Court is presented with. So in order, it seems, for my opponents to be successful in their argument, this Court would have to ignore the Delaware decision from the outset. It would then have to find that the delegation clause within the Capstone Services Agreement, because that was the agreement Mr. Ramos said he was operating under, clearly and unmistakably gave him the authority to decide all substantive arbitrability issues. The problem with that theory, that argument, is that both Judge Miller and tacitly Judge Andrews, by making the decision that he reached, have all agreed that the attack on the arbitration provision in the Capstone Services Agreement, saying this can be read to take us to court, this can be read seven or eight different ways, rendered the delegation line in the arbitration clause of the Capstone Services Agreement something less than clear and unmistakable. In other words, it could have just gone to a court, or Delaware jurisdiction could have met the application of some other Delaware rules, be they civil procedure or arbitration rules that may exist. And so for that reason, all of these decisions, these substantive arbitrability decisions, these validity questions, questions like jurisdiction, intervention, are questions for the court, not for Mr. Ramos. But you have to ignore all of that to agree with the opponents. And then, once you've decided that Poole Ree, a non-signatory to the Capstone Services Agreement, but at the same time a party to another agreement that called for a different forum, a different arbitrator, different rules, etc., could nonetheless intervene. And then, on top of that, I think you would have to agree with the opponents that the declaratory judgment action filed by Poole Ree, which was simply, please tell me I've done nothing wrong, when it's never been alleged that they did anything wrong, somehow arose under and was related to the Capstone Services Agreement. I don't think any of those decisions are decisions that can be reached within the record before this court without ignoring the controlling law. And I believe this supplemental authority argument leads into the estoppel argument, which also was never raised below. But first off, just as a matter of equity and law, where there is a contract, a court needn't look to equity. And here there is a contract. There's a contract between Poole Ree and OSI that contains an arbitration clause, one that was completely ignored by Mr. Ramos. So we needn't look at the Grigson case for the proposition that somehow OSI should be equitably estopped from objecting to the participation of Poole Ree in this other arbitration, this other flawed arbitration. But Grigson's different for a lot of reasons. OSI, unlike Grigson, didn't file an arbitration demand against Capstone and then separately sue Poole in a court alleging the same causes of action, relying on the same facts. That's not what happened. So the cases are not parallel. On top of that, I think the overriding motivation in the Grigson decision was if we let Matthew McConaughey get sued individually on the same causes of actions and claims as they're being arbitrated against Tristar, we've defeated the purpose of arbitration. We've got this parallel track, but one is in court and one is in arbitration. That's not what happened here. We would have two cases in arbitration under two separate agreements, applying two separate rules with two separate arbitrators. And it raises a hypothetical. And that is, what if one of those arbitrators were to decide at the request of one party over the objection of another to consolidate those cases? Just because consolidation under Halcyon is a matter of procedural arbitrability, would that divest the other arbitrator of jurisdiction? I mean, it's a bit of a brain teaser. It's a puzzle. But the fact of the matter is, I think the court would step in in those circumstances to say, absolutely not. At some point, even though consolidation, which this is not, this is intervention, is a matter of procedural arbitrability and therefore always reserved for the arbitrator, we have a valid arbitration agreement with different terms, with a different arbitrator going forward simultaneously who is equally authorized. I think both of those arbitrations would then go forward on parallel tracks. Because to enforce one's own arbitration agreement is not to defeat the purpose of arbitration. Is there a danger that there would be conflicting decisions if you had two different arbitrations going? There absolutely is. And you would hope under those circumstances the party could come to some agreement to consolidate or to resolve that potentiality. But there's language, there's language in the services agreement that speaks to the fact that the parties understand that, for example, the IP claims that were brought up in the phase two arbitration demand would go forward in this court, while other claims would go forward somewhere else, understanding that this could result in parallel litigations. So that was even built into the contract to understand that that's the point. And even the consolidation cases talk about this because the parties agreed to allow a claim that did not fall under the agreement to be ruled on by that arbitrator. Without that consent, parallel tracks are a result. And the downside is what your Honor just pointed out, but it's something that would have to be reconciled by the courts at a later point. Not something that can divest an arbitrator of jurisdiction midstream. We haven't a case that stands for that principle anymore. Then there was the argument, and I have about five minutes left, that the court should not have vacated the entire award. That somehow Judge Miller should have tried to salvage some portion of the award. And the lumber liquidators case was relied on for that proposition. The problem with applying our facts, our circumstances, to the lumber liquidators rationale, is that in lumber liquidators there was a party moving to vacate, and they sought an amendment to make that damages correction under Section 11 of the FAA. Section 11 of the FAA was not invoked in this case by either party. So the idea that Judge Miller should have corrected the award, well that question was never before him, and so it's not we'll deal with it. And what they said, relying on several cases they cited, was the only thing that the court could correct would have been a mathematical error if it had been apparent on the face of the award. It wasn't in that case. It's not in this case. So why not a remand with instructions for a rehearing by the arbitrator to get at this damages issue? Well, number one, it's not the only problem, and I don't think the court was clear in saying that. You know, one of the issues that this involvement of Pool Ray's intervention caused was this damages question of the inability to sort out attorney's fees. The problem with that is the arbitrator, Ramos, Mr. Ramos, was divested of jurisdiction at the four-month point when he issued his final award. Now, so he can't under functus officio, the principle that once that happens, the arbitrator no longer has power, prevents him from ruling. Now, my opponents point out the Anderman-Smith case, and they say, well, there was a case that I think ran through this court in which the court said where the arbitrator had a 60-day window division of ruling, but he nonetheless, in his ruling, retained jurisdiction for a year over the application of the remedy because otherwise the remedy would have been rendered useless, essentially, that we're going to allow that to stand as an arbitration ruling. But it relied heavily on the language of the contract and the facts of the circumstances of the case that otherwise that remedy would have been pointless. There would have been an immediate change of the pricing model that was dictated by the arbitrator, and they would have been back on arbitration again. The language in the contract here says that if the arbitrator fails to reach a final decision within four months of the demand, any party can select a new arbitrator, and doing so immediately divests the previous arbitrator of any authority in the case. Well, if we remand now for a rehearing by Mr. Ramos, not only has OSI already selected another arbitrator after the four months has expired, but that arbitration has come to a conclusion and is now before the district court again in Delaware. So Mr. Ramos has absolutely no authority, and when you look at the language of Section 10b, that's the only part of the FAA, rather, that talks about rehearings. It's not only discretionary, which is supported by all the cases, but it's only discretionary if the time within the agreement required for an award has not expired. It clearly has. And I should briefly address the phase two arbitration, although I did not hear argument today on that score, and I think the argument there is twofold. One, the capstone parties never signed this services agreement. Several points on that. I think your honors have seen the letters that are drafted on capstone letterheads signed by Stuart Feldman on behalf of capstone that are representative. On top of that, capstone expressly demanded arbitration under it in the phase two arbitration, referencing it, as I said, expressly. Capstone admitted in the Delaware proceedings that these were integrated agreements and the capstone services agreement was the basis for that and an argument that the venue clause in it, or venue and jurisdiction clause, should only apply to IP cases and everything else should go to arbitration. And in this stage, I should point out, there is no preference for arbitration. This is a question in the validity stage of the analysis of these contracts. So that said, as Judge Owens pointed out, Judge Andrews and Judge Miller have correctly construed that language, harmonized it. Judge Miller asked to the IP litigation under Article V going to the courts of Harris County, Texas, and Judge Andrews asked to other claims go into arbitration in Delaware, the Delaware arbitrator, but that leaves the issue of whether or not Texas would acknowledge or uphold a venue clause. I think the default venue or jurisdiction under that civil code section that's referenced would be Harris County anyway under the circumstances, but nonetheless, if we struck out Harris County, Texas, the word courts would survive, meaning these phase two claims belong in a court. There's no agreement to arbitrate them. All right. Thank you, Mr. Lipinski. Mr. Dorman, you've saved time for a bow. Thank you, Your Honor. May it please the Court. I'd like to address right off the bat this concept that we're talking about the validity inquiry on arbitrability. The OSI parties have conceded that these claims are arbitrable. They've done it in this court in their brief. They've done it in the Third Circuit. They've done it in front of Judge Andrews. They initiated their own arbitration in front of a Delaware arbitrator. There is no dispute here that the claims are arbitrable, so we're beyond that gateway determination, and even if that gateway determination were at issue in this case, all of the arbitration provisions, whether it's five or seven or ten or however many you want to count, all of them provide that the arbitrator will determine the threshold issue of arbitrability. Is that your estoppel argument that you just made? It's not an estoppel argument. It's the delegation of jurisdiction argument. That's the Rena Center case. There are some cases from this circuit following Rena Center, but it's essentially that there's at least two of the agreements, the parties specifically delegate the issue of arbitrability to the arbitrator and say that the courts have no involvement. They're divested of all jurisdiction and all powers to do anything when it comes to determining arbitrability. The other agreements that involve, and those same agreements involve or incorporate by reference the AAA rules, and Rule 7 of the AAA rules does the same thing. It vests the arbitrator with jurisdiction to determine his own jurisdiction as well as the validity scope and enforceability of the arbitration agreement. The arbitration provisions that incorporate the ICC rules, well, those ICC rules do the same thing. They have a similar provision to AAA Rule 7 that vests the arbitrator with jurisdiction to determine his own jurisdiction. So there is no way around that issue here. The arbitrator and not Judge Andrew should be determining arbitrability, and the arbitrator did that. And the arbitrator says in multiple rulings, there are jurisdictional rules, April 29th and May 1, where the arbitrator says he's construing all five agreements, all five arbitration provisions, and the capstone services agreement, and determines that all the issues are arbitrable. He says that in the arbitration award that he's construing all five arbitration provisions and finding that the claims are arbitrable. The important thing there is that the Supreme Court in Oxford Health v. Sutter has reaffirmed a long line of decisions out of that court saying that once the arbitrator arguably construes the contract and specifically the arbitration provision, then the court's inquiry comes to an end. Because however good, bad, or ugly the interpretation is, the parties and the court are bound by that arbitrator's decision. But that's assuming that the arbitrator is the correct arbitrator everyone agreed to. Well, it would be that the arbitrator determines his own jurisdiction here because of the delegation clause. So we don't have a court looking into that issue, plus the OSI parties have said all these claims are arbitrable. So when the capstone initiated the arbitration in March, no one's said that he didn't have the power to determine his jurisdiction and he made those findings. And I see that I'm out of time. Thank you. Yes, your case is under submission. Thank you, Mr. Gorman. The court will take a brief recess before hearing the final.